IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

NOEMI IRIZARRY,                          )     CASE NO. 1:13-CV-02161
                                         )
                 Plaintiff,              )
                                         )
          v.                             )     MAGISTRATE JUDGE
                                         )     VECCHIARELLI
                                         )
CAROLYN W. COLVIN,                       )
     Acting Commissioner of Social       )
     Security,                           )     **MEMORANDUM OPINION AND**
                                         )     **ORDER**
                 Defendant.              )

Plaintiff, Noemi Irizarry ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned United

States Magistrate Judge pursuant to the consent of the parties entered under the authority

of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final

decision is REVERSED and REMANDED for proceedings consistent with this opinion**.**

## I.    PROCEDURAL HISTORY

On April 19, 2010, Plaintiff filed her applications for POD, DIB, and SSI, alleging a

disability onset date of January 22, 2010.  (Transcript ("Tr.") 20.)  The claims were denied

initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On October 5, 2011, an ALJ held Plaintiff's hearing.

(*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A

vocational expert ("VE") also participated and testified.  (*Id.*)  On October 28, 2011, the ALJ

found Plaintiff not disabled.  (Tr. 17.)  On August 2, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On October 1, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 18, 19, 21.)

Plaintiff asserts the following assignments of error: (1) The ALJ violated the treating physician rule; (2) the ALJ erred by failing to use the "special technique" that must be used when a claimant is found to have severe mental impairments; (3) the ALJ failed to explain the weight given to examining Physician Assistant Basinski; (4) the ALJ's residual functional capacity did not adequately account for Plaintiff's moderate carpal tunnel; and (5) the ALJ's decision is unreviewable because the ALJ found that Plaintiff required a sit/stand option but made no findings about frequency or duration.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in February 1973 and was 36-years-old on the alleged disability onset date.  (Tr. 28.)  She had at least a high school education and was able to communicate in English.  (*Id.*)  She had past relevant work as a cafeteria cook, cafeteria worker, and a laundry worker.  (Tr. 27.)

### B.   Medical Evidence

#### 1.   Physical Impairments

##### a.   Medical Reports

On September 8, 2009, Plaintiff went to the emergency department of Community

2

Health Partners ("CHP") with complaints of back, right hip, and right knee pain after bending over and lifting a deep fryer at her job.  (Tr. 777, 780.)  She was diagnosed with back pain with sciatica and given injections of Dilaudid and Ketorolac Tromethamine as well as prescriptions for Motrin, Valium, and Vicodin. (Tr. 780-781.)

In September 2009, Plaintiff was treated at CHP under the care of Dan Basinski, PA-C, and James Anthony, M.D.  (Tr. 357-376.)  Plaintiff was diagnosed with low back sprain and strain.  (Tr. 359.)  An x-ray of the lumbosacral spine was negative.  (Tr. 366.)  A physical therapy evaluation showed a slightly antalgic gait, decreased range of motion in the trunk, and muscle spasms in the right lumbar paraspinals.  (Tr. 376.)  Plaintiff had three physical therapy appointments, but her therapy was discontinued after she did not return.  (Tr. 371.)  On September 17, 2009, Physician Assistant Basinski released Plaintiff to return to work with the following restrictions: no lifting, pulling, pushing, or carrying over five pounds; occasional bending, twisting/turning, standing/walking, reaching over the shoulder, and repetitive motion of injured part; no squatting/kneeling, climbing, or repetitive bending at the waist; frequent sitting; and allow 15 minutes to sit down every hour.  (Tr. 359, 363.)

Plaintiff had examinations of her lumbar spine for her Workers' Compensation claim in December 2009, May 2010, and December 2010.  (Tr. 378-381, 413-417, and 848-850.)  Objective findings from these exams included tenderness to palpation, antalgic gait, and reduced range of motion.  (Tr. 379, 415, 849.)  In December 2009, the examiner opined that Plaintiff was capable of light to moderate level work.  (Tr. 417.)

Chiropractor Mark Clark, D.C., treated Plaintiff from October 2009 to May 2010. (Tr. 460-498.)  In April 2010, Dr. Clark noted that Plaintiff was making progress in

3

controlling her back pain, but was still experiencing exacerbations of her symptoms.  (Tr. 382.)

Plaintiff saw Heather Scullin, D.O., a physical medicine and rehabilitation specialist, from March 2010 to December 2010, for neck, shoulder, back, and knee pain.  (Tr. 509-533, 825-846.)  In March 2010, an EMG/NCV study of the lower extremities showed subtle left L5 radiculopathy and sensory neuropathy, and an EMG/NCV of the upper extremities showed mild right carpal tunnel syndrome.  (Tr. 529.)  Dr. Scullin treated Plaintiff with medication, physical therapy, and a right wrist splint.  (Tr. 515, 523.)  Dr. Scullin also provided trigger point injections.  (Tr. 509-511, 518-519.)  In July 2010, Plaintiff reported that the injections helped a little.  (Tr. 840.)  On November 16, 2010, Plaintiff reported that her pain was "overall better."  (Tr. 834.)  A second EMG/NCV of the upper extremities from November 30, 2010, revealed moderate right carpal tunnel syndrome.  (Tr. 826.)  On December 15, 2010, Plaintiff's gait was normal and her back and extremities had normal strength and range of motion.  (Tr. 829.)

Plaintiff was treated at Kolczun & Kolczun Orthopedics from May 2010 to June 2011 for pain and numbness in the right upper extremity.  (Tr. 686-728.)  In May 2010, orthopedic surgeon Frank Sabo, M.D., saw Plaintiff for evaluation of her right wrist.  (Tr. 725.)  Plaintiff's wrist was tender, but she had excellent finger motion and tests for carpal tunnel syndrome were negative.  (*Id.*)  An x-ray of her right wrist showed no acute abnormality.  (*Id.*)  Dr. Sabo's impression was right wrist pain of uncertain etiology.  (*Id.*)  He gave Plaintiff a cortizone injection in her right wrist and recommended a wrist splint.  (*Id.*)  At a follow-up visit with Dr. Sabo in June 2010, Plaintiff reported that the injection did not help much, and Dr. Sabo stated that he did not believe surgery would help her.  (Tr.

4

720-721.)  He also informed Plaintiff that he did not believe she had carpal tunnel syndrome, as her pain and symptoms were not consistent with that condition.  (Tr. 721.)

In June 2010, Plaintiff saw Jeffrey Biro, D.O., for evaluation of her right wrist and hand pain.  (Tr. 717.)  On examination, Plaintiff had full grip strength, negative tests for carpal tunnel, and minor pain to palpation over a small ganglion cyst.  (Tr. 718.)  Plaintiff followed up with Dr. Biro on February 23, 2011, for right wrist pain and numbness, and tingling of the index finger, middle finger, and thumb.  (Tr. 714.)  On examination, Plaintiff had positive Tinel's and Phalen's test on the right.  (*Id.*)  Dr. Biro forwarded Plaintiff's case to orthopedic surgeon David Shaprio, M.D.  (*Id.*)

Plaintiff saw Dr. Shapiro in March 2011.  (Tr. 711.)  On examination, Plaintiff had full motion of the cervical spine, negative Spurling's and traction tests for radicular pain, and positive Wright test on the right with loss of pulse, numbness, and tingling.  (*Id.*)  She had full range of motion of the shoulder but did have a positive impingement sign with good rotator cuff strength.  (*Id.*)  Plaintiff's wrist and digital motion were full.  (*Id.*)  She had a positive Tinel's test at the left carpal tunnel and in the right extremity, including the lateral forearm, radiating into the index and long fingers.  (*Id.*)  Phalen's test and carpal tunnel compression tests were positive on the right and neurological examination was normal with good strength.  (*Id.*)

Dr. Shapiro also reviewed the EMGs performed by Dr. Scullin.  (Tr. 711, 825-826.)  While Dr. Scullin interpreted the EMG as moderate right carpal tunnel syndrome, he considered the changes relatively mild.  (Tr. 711, 826.)  Latencies and amplitudes were all normal in the median, radial, and ulnar nerves.  (Tr. 711.)  Dr. Shapiro's impression was carpal tunnel syndrome with thoracic outlet syndrome and diffuse upper extremity Tinel's

5

test with near normal EMG on the right, and a right wrist ganglion.  (*Id.*)  Dr. Shapiro

injected Plaintiff's right carpal tunnel without complication.  (*Id.*)

In March 2010, Plaintiff began seeing rheumatologist Ali Malick, M.D.  (Tr. 594.)

She had nine appointments with Dr. Malick between March 2010 and June 2011.  (Tr. 586-

595.)  On March 9, 2010, Dr. Malick assessed bilateral hip pain/hip bursitis and knee

valgus deformity/degenerative joint disease (DJD) and injected Plaintiff's hip.  (Tr. 595-

596.)  The following week, Plaintiff reported that the hip injection had helped.  (Tr. 593.)  Dr.

Malick continued Relafen, which had been helping, and he planned to have Plaintiff attend

aquatic therapy.  (*Id.*)  Plaintiff's knee x-rays showed that the articular surfaces were

preserved with slight lateral subluxation seen involving the right patella in relationship to the

trochanter.  (Tr. 544.)  Her hip x-rays were normal.  (*Id.*)

On May 3, 2010, Plaintiff reported to Dr. Malick that she still had low back

discomfort "on and off," but the injection, Relafen, and aquatic therapy had helped her low

back.  (Tr. 592.)  On examination, Plaintiff's shoulders, hips, and knees showed a good

range of motion.  (*Id.*)  She had mild to moderate discomfort in the lumbar region and

mildly decreased spinal flexion.  (*Id.*)  Dr. Malick assessed trochanteric bursitis

(significantly improving) and low back pain.  (*Id.*)  He continued Relafen and aquatic

therapy, and added a TENS unit to Plaintiff's regimen to help her low back discomfort.

(*Id.*)

In June 2010, Plaintiff reported that the TENS unit had helped her back, and

although she had mild right hip discomfort, she was tolerating it well.  (Tr. 591.)  On

examination, Plaintiff's knees had a full range of motion with valgus deformity.  (*Id.*)  Her

hips and lower back were mildly tender, but straight-leg raising was negative bilaterally.

6

(*Id.*)  Dr. Malick assessed low back and hip pain.  (*Id.*)  He explained that Relafen and acquatic therapy were helping, the TENS unit helped Plaintiff's low back pain by about 30%, and Plaintiff's hip seemed stable.  (*Id.*)

Plaintiff followed up with Dr. Malick on September 7, 2010, with complaints that her right hip had been hurting for a few weeks.  (Tr. 590.)  Plaintiff was tender to hip palpation, and she had mild discomfort in her lower lumbar region. (*Id.*)  Straight-leg raising was negative with no other red, hot, or swollen joints.  (*Id.*)  Dr. Malick assessed improving low back and hip pain.  (*Id.*)  He discontinued Relafen, as it was causing acid reflux, and he gave Plaintiff a trial of Tremadol.  (*Id.*)

Plaintiff saw Dr. Malick on November 4, 2010, for a follow-up of her hip and back pain.  (Tr. 589.)  Plaintiff reported that she felt well overall.  (*Id.*)  On examination, her lumbar region showed no tenderness; her hip showed minimal tenderness; and straight-leg raising was negative.  (*Id.*)  Flexion of the spine was intact with some limitation.  (*Id.*)  Dr. Malick assessed low back and hip pain, but noted that Plaintiff was doing well with her current regimen.  (*Id.*)

Plaintiff followed up with Dr. Malick on February 10, 2011, and reported that overall the TENS unit and Tramadol helped, but her hips and right hand were bothering her.  (Tr. 588.)  On examination, there was moderate tenderness of the lower lumbar region and hip, flexion of the spine was decreased, and examination of the hands showed numbness in the carpal tunnel distribution.  (*Id.*)

Plaintiff's May 16, 2011, lumbar spine and hip x-rays showed no evidence of acute disease.  (Tr. 742.)  On June 9, 2011, Plaintiff reported once again that the TENS unit was helping, and she expressed that she would like to have bariatric surgery to lose weight.

(Tr. 586.)  On examination, she had mild bilateral subacromial bursitis and lower lumbar tenderness.  (*Id.*)  There was a small nodule Plaintiff's right wrist and her right hip had moderate tenderness.  (*Id.*)  Dr. Malick assessed low back pain, hip pain/trochanteric bursitis, and carpal tunnel syndrome.  (*Id.*)

### b.  Opinion Evidence

On January 5, 2010, Plaintiff underwent an independent medical evaluation with Dean W. Erickson, M.D., for lumbar sprain and strain.  (Tr. 413.)  Dr. Erickson noted that Physician Assistant Basinski had advised light duty work, which Plaintiff stated she did continue to perform.  (*Id.*)  Dr. Erickson reported "mild symptom magnification behavior indicators including vague and inconsistent historian and patient report of injury inconsistent with other documentation."  (Tr. 414-415.)  Examination of the lumbar spine revealed a slight right anterior rotation with some pelvic instability.  (Tr. 415.)  Plaintiff had an increased lordotic curve secondary to obesity and complained of tenderness in the right sacroiliac joint, paralumbar muscles, and midline axial spine with positive Gaenslen's to the right, indicating pain originating from the sacroiliac joint.  (*Id.*)  Straight leg-raising reproduced right low back pain only at 75 degrees supine but was otherwise negative.  (*Id.*)  Her neurologic examine was normal.  (*Id.*)  Plaintiff could flex to 50 degrees, extend to 20 degrees, and bend to 25 degrees.  (*Id.*)  Dr. Erickson assessed lumbar strain and sprain, resolving; postural abnormalities secondary to pelvic rotation and obesity; mild symptoms magnification behavior; and no evidence of radiculopathy.  (*Id.*)  Dr. Erickson opined that Plaintiff was capable of light-to-moderate level work with occasional 30 pound lifting; frequent 20 pound lifting; and carrying, pushing, and pulling with some limitation on repetitive bending and crawling.  (Tr. 417.)

8

On July 12, 2010, state agency reviewing physician W. Jerry McCloud, M.D., opined that Plaintiff would be capable of medium work, with occasionally climbing ramps/stairs and stooping, and never climbing ladders, ropes, or scaffolds.  (Tr. 107.)  Dr. McCloud assessed these limitations due to Plaintiff's degenerative disc disease of the lumbar spine and radiculopathy.  (*Id.*)  On September 20, 2010, state agency reviewing physician Gerald Klyop, M.D., gave the same opinion.  (Tr. 128.)

### 2.     Mental Impairments

#### a.     Medical Reports

Plaintiff received treatment and counseling for post-traumatic stress disorder (PTSD) and dysthymic disorder at the Nord Center.  (Tr. 292-354, 657-684.)  On April 3, 2009, Plaintiff was diagnosed with major depression, unspecified.  (Tr. 310.)  Counseling and a psychiatric evaluation for medications were recommended.  (*Id.*)  Psychiatrist Dilbagh Saini, M.D., conducted a psychiatric evaluation on May 4, 2009.  (Tr. 322-323.)  Dr. Saini diagnosed Plaintiff with PTSD and dysthymic disorder, and started her on an anti-depressant.  (*Id.*)  An anti-anxiety medication was added in December 2010.  (Tr. 673-674, 684.) Plaintiff continued treatment at the Nord Center with counseling and/or doctor appointments approximately monthly through the time of her hearing.  (Tr. 324-354, 657-684, 852-853.)

On February 23, 2011, Plaintiff's treating psychiatrist F. Gregory Noveske, M.D., spoke to Plaintiff about her upcoming bariatric surgery.  (Tr. 661-662.)  Dr. Noveske noted that Plaintiff had been emotionally stable for some time, and he saw no psychiatric contraindications to the surgery, though after the surgery she would have to take her anti-depressant medication in a different form.  (*Id.*)

9

### b.     Opinion Evidence

On September 21, 2011, Dr. Noveske completed a medical source statement regarding Plaintiff's mental impairments.  (Tr. 852-853.)  Dr. Noveske opined that Plaintiff was moderately limited in the following areas: maintaining attention and concentration for two-hour periods of time; performing work activities at a reasonable pace; keeping a regular work schedule and maintaining punctual attendance; interacting appropriately with others (*e.g.*, public, supervisors, coworkers); withstanding stresses and pressures of routine, simple, unskilled work; and making judgments that are commensurate with the functions of unskilled work (*i.e.,* making simple work-related decisions).  (*Id.*)  Dr. Noveske noted that these limitations lasted or were expected to last at least 12 months, and that Plaintiff was diagnosed with PTSD and dysthymic disorder.  (*Id.*)

On July 12, 2010, state agency reviewing psychologist Bruce Goldsmith, Ph.D., opined that Plaintiff was mildly restricted in the following areas: activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace.  (Tr. 105-106.)  On September 16, 2010, state agency reviewing psychologist Cynthia Waggoner, Psy.D., offered the same opinion.  (Tr. 126.)

### C.     Hearing Testimony

#### 1.     Plaintiff's Hearing Testimony

Plaintiff's last job was with Lorain City Schools in 2009.  (Tr. 47.)  She testified that she was injured on September 8, 2009, and left her job because her employer would not give her work that was within her doctor's restrictions and she was having a lot of pain.  (Tr. 48.)  Plaintiff received Worker's Compensation in 2010.  (Tr. 47.)

Plaintiff had a driver's license and drove about four days per week.  (Tr. 45.)  She

had a high school education and could read, write, and do basic math.  (Tr. 47.)  She had

four children and was separated from her husband.  (Tr. 46.)  Plaintiff went grocery

shopping twice per week with her children and drove her children to their appointments.

(Tr. 71.)  In the morning, she would walk her son to the bus stop.  (*Id.*)

At the time of the hearing, Plaintiff was going through the process of getting medical

and insurance approval for gastric bypass surgery.  (Tr. 44.)  She testified that her height

was five feet and her weight was 250 pounds.  (Tr. 43.)  She did not require a cane to

walk.  (Tr. 55.)  She took pills for back pain and stated that her doctor would not give her

injections in her lower back due to her weight.  (Tr. 60.)  Plaintiff stated that she had a

TENS unit which lessened her pain and helped her to do things around the house.  (Tr.

61.)  Plaintiff also had pain in her knees and hip.  (Tr. 64.)  She also stated that she had a

cyst on her right wrist which caused numbness in her fingers.  (Tr. 53-55.)

Plaintiff testified that she saw a doctor and counselor at the Nord Center and took

medication for depression.  (Tr. 61, 72-73.)  The medication helped her to be a little more

active.  (Tr. 59.)  She stated that depression did not affect her ability to follow directions or

instructions or affect her memory or concentration.  (*Id.*)

Plaintiff stated that after a half hour of doing household chores such as washing

dishes or cooking, her back and hands began to hurt and her leg became numb.  (Tr. 51.)

Her children often helped her finish her chores.  (Tr. 51-52.)  Plaintiff could change from a

standing to sitting position but had problems bending at the waist.  (Tr. 65.)  Plaintiff stated

that she had problems with her hands.  (Tr. 66.)  She testified that, for example, when she

cooked she would drop things and have to use her left hand even though she is right-

handed.  (*Id.*)  She had some problems getting her car key into the ignition when driving,

and brushing her hair made her hands numb.  (Tr. 67, 69.)  Plaintiff could perform light chores like walking her dog or separating laundry.  (Tr. 70.)  She stated that her children helped her with heavy chores like sweeping, mopping, and laundry.  (Tr. 70-71.)

### 2. Vocational Expert's Hearing Testimony

Dr. Borgeson, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience.  (Tr. 81.)  The individual would be capable of performing light work and would be limited to occasional climbing of ramps and stairs and occasional stooping or bending at the waist.  (Tr. 83.)  The individual could not climb ladders, ropes, or scaffolds.  (*Id.*)  The individual would be limited to frequent reaching overhead and forward with the right dominant hand.  (*Id.*)  The individual would require a sit/stand option and would be limited to simple repetitive tasks in an environment free of fast-paced production quotas.  (Tr. 83-84.)  The VE testified that the hypothetical individual would be capable of performing such jobs as cashier II (Dictionary of Occupational Titles ("DOT") 211.462-010) and mail clerk, not in the post office (DOT 209.687-026).  (Tr. 84.)

### III.     STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." Abbot, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since January 22, 2010, the alleged onset date.

3.   The claimant has the following severe impairments: trochanteric bursitis,

lumbar sprain/strain, moderate carpal tunnel of the dominant right wrist, history of osteoarthritis and valgus deformity of the bilateral knees (but mostly in the right knee), obesity, post-traumatic stress disorder, and dysthymic disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a reduced range of light work with the following limitations.  The claimant is limited to occasional climbing of ramps and stairs.  She is limited to occasional stooping (i.e., bending at the waist.)  She is not able to climb ladders, ropes, and scaffolds.  She is limited to only frequent reaching overhead and forward with the right dominant hand.  She will require an additional sit/stand option.  She is limited to simple repetitive tasks in an environment free of fast-paced production quotas.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born in February 1973 and was 36-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 22, 2010, through the date of this decision.

## V.    LAW & ANALYSIS

## A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

14

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

#### 1.    The ALJ Violated the Treating Physician Rule.

Plaintiff argues that the ALJ violated the treating physician rule[1] by giving treating

---

[1]    The treating physician rule provides that "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). Conversely, a treating

15

psychiatrist Dr. Noveske's opinion "considerable weight," but failing to account for Dr. Noveske's opinion that Plaintiff is moderately limited in maintaining attention and concentration and interacting appropriately with others.  The Commissioner responds that the ALJ accounted for Plaintiff's moderate limitations by limiting her to simple, repetitive work that is free of fast-paced production or quotas.  The Commissioner further argues that the ALJ was not required to adopt Dr. Noveske's assessment of Plaintiff's social imitations, because the record shows that Plaintiff had no problems getting along with others, as she spent time with her four children and her brother and sister.  Moreover, the Commissioner notes that the jobs the VE identified that Plaintiff could perform involve work with things, not people.

To support his argument that the ALJ's RFC did not adequately account for Plaintiff's mental limitations, Plaintiff cites to *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010).  In *Ealy*, the record showed that the claimant had a limited ability to maintain attention over time, even when performing simple, repetitive tasks.  *Ealy*, 594

--------

source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

16

F.3d at 516. The ALJ limited the claimant only to simple, repetitive tasks without any additional time-based limitations, and the Sixth Circuit concluded that the ALJ failed to adequately capture the claimant's limitations in concentration, persistence, and pace. *Id.*

*Ealy* undoubtedly stands for the proposition that an ALJ's hypothetical to a VE must adequately describe a claimant's limitations in order to serve as substantial evidence in support of the ALJ's conclusions. *Id.* at 517. *Ealy* "does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace." *Jackson v. Comm'r of Soc. Sec.*, No. 1:10-cv-763, 2011 WL 4943966, at *4 (N.D. Ohio Oct. 18, 2011) (Boyko, J.). Rather, "*Ealy* stands for a limited, fact-based ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions." *Id.* at 4.

Here, unlike in *Ealy,* the ALJ included mental limitations in Plaintiff's residual functional capacity (RFC) that adequately reflect Dr. Noveske's opinion that Plaintiff was moderately limited in her ability to maintain attention, concentration, and pace. The ALJ limited Plaintiff to simple, repetitive, routine tasks – which addressed her moderate limitation in concentration and attention – performed in an environment free of fast-paced production quotas – which addressed her limitation in performing work at a reasonable pace. Although the ALJ did not adopt Dr. Noveske's exact phrasing, the limitations in Plaintiff's RFC address Dr. Noveske's concerns regarding Plaintiff's ability to perform work. *See Divins v. Astrue*, No. 3:11cv00033, 2012 WL 220246, *11 (S.D. Ohio Jan. 25, 2012) ("There is no requirement that the ALJ adopt the precise language offered by a medical source, as long as the ALJ's conclusion is supported by substantial evidence."). Plaintiff points to no evidence in the record that supports a need for additional or greater

17

non-exertional limitations.   Indeed, other than the conclusory assertion that the restrictions

are insufficient, Plaintiff fails to argue or explain how the restrictions failed to account for

her moderate restrictions in concentration, attention, and pace.

While the ALJ's RFC determination adequately accounts for some of the limitations

assessed by Dr. Noveske, it fails to address altogether Dr. Noveske's opinion that Plaintiff

was moderately impaired in her ability to interact appropriately with others (*e.g.*, public,

supervisors, coworkers).  It is well established that an ALJ is not required to discuss each

and every piece of evidence in the record for his decision to stand.  *See, e.g., Thacker v.*

*Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of

a medical source contradicts his RFC finding, an ALJ must explain why he did not include

its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774

F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ

must give some indication of the evidence upon which he is relying, and he may not ignore

evidence that does not support his decision, especially when that evidence, if accepted,

would change his analysis.").

Here, the ALJ purports to accept Dr. Noveske's September 2011 opinion that

Plaintiff was moderately impaired in the area of social functioning, as the ALJ assigned

"considerable weight" to Dr. Noveske's mental assessment, noting that it was consistent

with his treatment notes.  (Tr. 853.)  The ALJ did not, however, include any limitations

relating to social interaction in Plaintiff's RFC, nor did he explicitly reject Dr. Noveske's

opinion regarding Plaintiff's social limitations or explain his reasons for not adopting Dr.

Noveske's opinion.  The Commissioner argues that the ALJ was not required to adopt Dr.

Noveske's assessment of Plaintiff's social limitations, because the record shows that

18

Plaintiff had no problems getting along with others, and because the jobs the VE identified that Plaintiff could perform involve work with things, not people.  The ALJ, however, did not identify or discuss these rationales when implicitly rejecting Dr. Noveske's opinion regarding Plaintiff's social limitations.  "[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action.  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Berryhill v. Shalala, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion)* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983)* (citation omitted)).  Accordingly, Plaintiff has identified a basis for remand of her case.  On remand, the ALJ shall clearly address Dr. Noveske's opinion regarding Plaintiff's limitation in social functioning and accurately account for any limitation the ALJ finds in that area in Plaintiff's RFC.

> **2.  The ALJ Erred by Failing to Use the "Special Technique" That Must be Used When a Claimant is Found to Have Severe Mental Impairments.**

Plaintiff argues that the ALJ erred by failing to conduct the Psychiatric Review Technique that must be used when a claimant is found to have severe mental impairments.  The regulations provide a "special technique" for evaluating the severity of a mental impairment at steps two and three of the sequential evaluation process.  20 C.F.R. § 404.1520a(a).  At step two of the process, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)."  20 C.F.R. § 404.1520a(b)(1).  If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad

19

functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."[2]  20 C.F.R. §§ 404.1520a(b)(2), (c)(3). The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using the following four-point scale: none, one or two, three, four or more.  *Id.*  If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled.  20 C.F.R. § 404.1520a(d)(1).  Otherwise, the impairment is considered severe and the ALJ will proceed to step three.  20 C.F.R. § 404.1520a(d)(2).  At step three, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder."  20 C.F.R. § 404.1520a(d)(2).  Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 404.1525(c)(3). A claimant must satisfy all of the criteria to meet the listing.  *Id.*

Here, the ALJ concluded that Plaintiff's post-traumatic stress disorder and dysthymic disorder constituted severe impairments at step two, but concluded at step three that the impairments did not meet or medically equal one of the listed impairments. (Tr. 22-23.)  In making this finding, the ALJ noted that he considered whether the "paragraph B" criteria were satisfied; however, he did not make specific findings regarding Plaintiff's degree of limitation in each of the four functional areas.  (Tr. 23.)  The Commissioner concedes that the ALJ did not technically adhere to all of the requirements

---

[2]        These four functional areas are commonly known as the "B criteria."

of the "special technique" for evaluating mental impairments under the regulations, but argues that the error was harmless, citing *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). In *Rabbers,* the Court held that the ALJ's failure to use the "special technique" for evaluating the severity of a mental impairment was harmless, because the ALJ properly rejected the only evidence in the record that would have potentially supported a finding that Plaintiff satisfied the B criteria of a listed impairment, and therefore the ALJ's failure to specifically rate the B criteria did not prejudice Plaintiff on the merits.  *Rabbers,* 582 F. 3d at 661.

Plaintiff argues that the ALJ's error was not harmless, because "there is significant evidence of psychiatric limitations beyond those recognized in the RFC finding."  (Plaintiff's Brief ("Pl.'s Br.") at 21.)  In making this broad statement, however, Plaintiff does not identify evidence in the record that supports her claim.  Indeed, the Court is inclined to agree with the Commissioner's opinion that even if the ALJ had conducted the Psychiatric Review Technique, he still would have concluded at step three that Plaintiff's symptoms were not of listing-level severity.  As the Commissioner correctly notes, Plaintiff's treating psychiatrist Dr. Noveske found that Plaintiff had no more than moderate limitations in any area of mental functioning.  (Tr. 852-853.)  Furthermore, the ALJ specifically asked Plaintiff's counsel at the hearing whether he believed that any of the listings are met in this case, and Plaintiff's counsel responded "I do not believe so."  (Tr. 43.)  Nonetheless, because Plaintiff's first assignment of error presents a basis for remand of her case, the Court will not determine the issue of whether the ALJ erred in his evaluation of Plaintiff's mental impairments.  Instead, the Court directs the ALJ on remand to properly conduct the Psychiatric Review Technique pursuant to 20 C.F.R. § 404.1520a.

3.     The ALJ Failed to Explain the Weight Given to Examining
       Physician Assistant Basinski.

Plaintiff argues that the ALJ erred in failing to explain the weight he assigned to the opinion of Physician Assistant Basinski that Plaintiff was limited to lifting five pounds.  On September 10, 2009–two days after Plaintiff's work-related injury–Mr. Basinski opined that Plaintiff should not lift more than five pounds.  (Tr. 363.) On September 29, 2009, Mr. Basinski again opined that Plaintiff should not lift more than five pounds.  (Tr. 359.)  In his decision, the ALJ briefly acknowledges Plaintiff's treatment with Mr. Basinski,[3] but does not indicate the weight assigned to his opinion.  Plaintiff maintains that the ALJ erred by failing to explain why he did not account for Mr. Basinski's recommendation regarding Plaintiff's ability to lift.  For the following reasons, Plaintiff's argument is not well taken.

Plaintiff concedes that physicians assistants, like Mr. Basinski, are not considered "acceptable medical sources."  (Pl.'s Br. at 21.)  Nonetheless, Social Security Ruling 06-3p explains that opinions and other evidence from medical sources who are not acceptable medical sources are still relevant to the ALJ's determination of a claimant's RFC:

---

[3]    In discussing the medical evidence, the ALJ notes: "On September 10, 2009, treating source Dan Basinski, PAC limited the claimant to light duty, which she continued to perform at work through her alleged onset date. (Exhibit 3F, page 37.)"  (Tr. 25.)  The exhibit the ALJ cites to, however, does not correspond with Mr. Basinski's treatment notes, but rather is an Independent Medical Evaluation by Dr. Erickson from December 2009.  (Tr. 413.)  Notes from that evaluation recount that Plaintiff followed up with Mr. Basinski on September 10, 2009, and that Mr. Basinski "advised light duty which [Plaintiff] states she did continue on."  (*Id.*)  A review of Mr. Basinski's September 10, 2009, discharge report, however, does not indicate that he recommended Plaintiff could perform light work, as he noted that she should not lift, pull, push, or carry anything over five pounds.  (Tr. 363.)

22

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, *6 (S.S.A Aug. 9, 2006). Furthermore, Social Security Ruling 06-3p provides that when evaluating opinion evidence from medical sources who are not "acceptable medical sources," certain factors should be considered,[4] such as:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

Id. at *4-5.

Here, despite the ALJ's failure to explain the weight he afforded to the opinion of Mr. Basinski, the Court is nonetheless capable of conducting a meaningful review of the ALJ's decision. As the Commissioner notes in her Brief, Mr. Basinski's evaluation of Plaintiff appears to be limited to two checkmark opinions both rendered within the same month of Plaintiff's work-related injury in September 2009. (Tr. 359, 363.) Thus, Mr. Basinski did not

---

[4] Not every factor for weighing evidence will apply in every case. SSR 06-03P, *5 (S.S.A. Aug. 9, 2006).

23

even treat Plaintiff after her alleged disability onset date of January 22, 2010.  Moreover, it appears that Mr. Basinski's opinions relate to Plaintiff's capabilities immediately following her injury, as the check box forms he filled out were discharge reports suggesting exertional restrictions that should have been applied when Plaintiff returned to work.  (Id.)  There is no indication that Mr. Basinski, who had only a brief treatment relationship with Plaintiff, expected Plaintiff's physical limitations to last for 12 consecutive months.  Finally, even if the ALJ erred in failing to explicitly acknowledge Mr. Basinski's opinion regarding Plaintiff's ability to lift, that error would be harmless, as substantial evidence supports the ALJ's limitation of Plaintiff to a limited range of light work.  Notably, in January 2010, Dr. Erickson opined that Plaintiff could occasionally lift 30 pounds and frequently lift 20 pounds.  (Tr. 417.)  Notes from Dr. Erickson explicitly state that he made this determination after conducting a physical examination of Plaintiff and reviewing her available medical records, including records from Mr. Basinski. (Tr. 413-415.)  For these reasons, the ALJ's failure to explain the weight he assigned to Mr. Basinski's opinion is, at most, harmless error, and Plaintiff's third assignment of error does not present a basis for remand.

### 4.    The ALJ's Residual Functional Capacity Did Not Adequately Account for Plaintiff's Moderate Carpal Tunnel.

Plaintiff argues that the ALJ erred by finding that Plaintiff had the severe impairment of moderate carpal tunnel of the dominant right wrist, but not including a limitation on handling or fingering in Plaintiff's RFC.  According to Plaintiff, a reduction in Plaintiff's ability to handle or finger should have been adopted or at least evaluated to accommodate her carpal tunnel syndrome.  For the following reasons, Plaintiff's argument lacks merit.

The ALJ limited Plaintiff to frequent reaching overhead and forward with the right

dominant hand.  (Tr. 23.)  Plaintiff maintains that reduction of reaching is not reasonably

attributed to carpal tunnel syndrome, but does not indicate which medical evidence in her

record supports this claim.  Thus, Plaintiff argues that the ALJ's RFC determination does

not adequately account for her carpal tunnel, but offers no medical or legal support for her

assertion.  Without any evidence from a physician indicating that Plaintiff's carpal tunnel

syndrome requires specific restrictions not included in Plaintiff's RFC, this Court is not in

a position to decide whether the ALJ erred in determining Plaintiff's physical capabilities.

The ALJ specifically noted in his decision that Plaintiff's "objective EMG results and

treatment notes suggest that the claimant is limited to only frequent reaching (overhead

and forward) with the right dominant hand."  (Tr. 26.)   As Plaintiff has failed to cite any

medical evidence or medical expert testimony supporting her claim that she has

restrictions with regard to handling or fingering, there is insufficient evidence to support a

conclusion that the ALJ erred by failing to include such limitations in Plaintiff's RFC.

Accordingly, Plaintiff's fourth assignment of error is without merit.

> **5.     The ALJ's Decision is Unreviewable Because the ALJ Found
> That Plaintiff Required a Sit/Stand Option but Made No
> Findings about Frequency or Duration.**

The ALJ found that Plaintiff requires a sit/stand option.  (Tr. 23.)  The VE testified

that considering Plaintiff's age, education, work experience, and residual functional

capacity–including her need for a sit/stand option–there are jobs that exist in significant

numbers in the national economy that she can perform.  Plaintiff argues that the ALJ's

RFC determination is too vague, because he was required to quantify the frequency and

duration of Plaintiff's need to sit and stand.  For the following reasons, Plaintiff's argument

is without merit.

Plaintiff points to no evidence in the record indicating how often or how long Plaintiff must sit or stand at will throughout an eight-hour workday, such that the ALJ's failure to quantify the frequency and duration of Plaintiff's sit/stand option would impact the outcome of her case.  Moreover, Social Security Ruling 83-12 states that in cases of unusual limitation of ability to sit or stand, a vocational expert should be consulted to clarify the implications for the occupational base.  SSR 82-12.  Here, the ALJ asked the VE to consider a hypothetical individual who would be capable of a limited range of light work with a sit/stand option.  (Tr. 84.)  The VE opined that there are jobs that an individual with such limitations could perform.  (Id.)

The ALJ has the responsibility of evaluating a witness's credibility.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  Furthermore, Plaintiff was represented by counsel at his hearing and was afforded an opportunity at that time to question the VE about any perceived inconsistencies in his testimony.  The ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by Social Security Regulation 00-4p.  It is the responsibility of plaintiff's counsel to challenge the accuracy of the VE's testimony through cross-examination of the VE.  *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009).  "The fact that plaintiff's counsel did not do so is not grounds for relief."  *Id.; see also Donahue v. Barnhart*, 446 F.3d 441, 446 (7th Cir. 2002) ("The ruling requires an explanation only if the discrepancy was 'identified'—that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation.  Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late.").  *But see Overman v. Astrue*, 546 F.3d 456, 463 (7th

Cir. 2008) (explaining that apparent conflicts include those that were so obvious during the VE's testimony that the ALJ should have noticed them and elicited reasonable explanations).   Here, had Plaintiff's counsel had a question about the frequency or duration of Plaintiff's need for a sit/stand option, he should have addressed that issue with the VE at Plaintiff's hearing.

Moreover, the only legal support for Plaintiff's argument that the ALJ erred in not specifying a frequency and duration for Plaintiff's sit/stand option is Social Security Ruling 96-9p, which discusses an individual's need to alternate the required sitting of *sedentary work* by standing.[5]  SSR 96-9p.  Here, however, the ALJ found that Plaintiff was capable of a reduced range of *light* work.  (Tr. 23.)  Thus, the only legal support Plaintiff offers to support her fifth assignment of error is inapplicable to the facts of her case.  The failure to explain, develop, or provide an analytical framework for an assigned error may result in the argument deemed waived.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).  For the foregoing reasons, Plaintiff's fifth assignment of error does not present a basis for remand.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.  On remand, the ALJ shall

---

[5]     Social Security Ruling 96-9p discusses the implications of a residual functional capacity for less than a full range of sedentary work.

clearly address Dr. Noveske's opinion regarding Plaintiff's limitation in social functioning and accurately account for any limitation the ALJ finds in that area in Plaintiff's RFC. Furthermore, the ALJ shall properly conduct the Psychiatric Review Technique pursuant to 20 C.F.R. § 404.1520a.

  **IT IS SO ORDERED**.

  _s/ Nancy A. Vecchiarelli_
  U.S. Magistrate Judge

Date: December 4, 2014

28